J-S62044-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: E.H., III | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.N. | : | No. 826 MDA 2017 |

Appeal from the Decree April 12, 2017
in the Court of Common Pleas of Franklin County Orphans' Court
at No(s): 9-Adopt-2017

BEFORE: STABILE, MOULTON, and STRASSBURGER*, JJ.

MEMORANDUM BY STRASSBURGER, J.: **FILED OCTOBER 20, 2017**

M.N. (Father) appeals from the decree entered April 12, 2017, in the Court of Common Pleas of Franklin County, which terminated involuntarily his parental rights to his minor son, E.H., III (Child), born in February 2016.[1] We affirm.

We summarize the relevant factual and procedural history of this matter as follows. Child was removed from Mother's care on March 4, 2016, pursuant to an order for emergency protective custody. N.T., 4/11/2017, at 28-30; Petitioner's Exhibit 1 (Order for Emergency Protective Custody) at 2.

_____

* Retired Senior Judge assigned to the Superior Court.

[1] Child's mother, D.L. (Mother), executed a consent to adoption form on April 10, 2017. N.T., 4/11/2017, at 27. The record does not reveal whether the orphans' court ultimately confirmed Mother's consent and terminated her parental rights.

Child was removed due to concerns regarding Mother's mental health, as well as her lack of support, housing, and parenting skills. N.T., 4/11/2017, at 29. Child was adjudicated dependent by order dated April 18, 2016. Petitioner's Exhibit 4 (Master's Recommendation for Adjudication and Disposition – Child Dependent). Franklin County Children and Youth Service ("CYS") initially believed Child's father to be E.H., II. *See*, *e.g.*, Petitioner's Exhibit 2 (Dependency Petition) at 3, 6. However, Father was established as the biological father of Child via paternity testing on April 29, 2016. Petitioner's Exhibit 11 (DNA Test Report).

On March 13, 2017, CYS filed a petition to terminate involuntarily Father's parental rights to Child. The orphans' court conducted a termination hearing on April 11, 2017. Following the hearing, on April 12, 2017, the court entered a decree terminating Father's parental rights. Father timely filed a notice of appeal on May 11, 2017, along with a concise statement of errors complained of on appeal.

Father now raises the following issues for our review.

1. Was there clear and convincing evidence presented at trial to establish that Father had evidenced a settled purpose of relinquishing parental claim to [Child] or that he refused or failed to perform parental duties for six months immediately prior to the filing of the petition?

2. Was there clear and convincing evidence to show that there was a repeated and continued incapacity, abuse, neglect or refusal of Father that has caused [Child] to be without essential care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse or neglect or refusal cannot or will not be remedied by Father[?]

- 2 -

3. Was there clear and convincing evidence to determine that [Child] will not be harmed by the severing of the bond with Father?

Father's Brief at 19 (unnecessary capitalization, orphans' court answers, and suggested answers omitted).

We consider Father's issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection

2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to subsections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as subsection 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under subsections 2511(a)(2) and (b), which provide as follows.

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions

described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. §§ 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to subsection 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the orphans' court found that Father is incapable of parenting Child, and that Father cannot, or will not, remedy his parental incapacity. Orphans' Court Opinion, 6/9/2017, at 20-22.  In so doing, the court determined that Father remains unable to meet Child's basic needs. *Id.* Specifically, the court found that Father was discharged from a parenting program due to his lack of progress and that Father's home remains unsafe for Child. *Id.* at 21-22. The court rejected Father's claim that he had been searching for a new home unsuccessfully for at least five months. *Id.*

Father argues that his only income comes from Social Security, which renders his lack of appropriate housing beyond his control. Father's Brief at 29; *see* 23 Pa.C.S. § 2511(b) (providing that a parent's rights may not be terminated "solely on the basis of environmental factors such as inadequate housing, … if found to be beyond the control of the parent"). Father argues that he attempted to prepare his home for Child, but that his landlord refused to make repairs, and refused to pay for an exterminator to ensure that the home is free of bedbugs. Father's Brief at 25-26. Father further argues that he was limited in his ability to participate in parenting instruction because his housing situation prevented him from having visits anywhere but in a public setting. *Id.*

Our review of the record supports the findings of the orphans' court. During the termination hearing, CYS presented the testimony of Alternative Behavior Consultants (ABC) program director, Emily Bakner. Ms. Bakner testified that Father participated in a parenting program through ABC from August 5, 2016 until October 21, 2016. N.T., 4/11/2017, at 5. Ms. Bakner explained that Father was discharged from the program due to his lack of progress, and opined that Father would not be capable of making sufficient progress in order to meet Child's needs in the future. *Id.* at 6-9. Ms. Bakner testified that Father often ignored or "laughed off" the directions provided to him by his parent educator. *Id.* at 23. While she admitted that Father sometimes complied with these directions, she testified that he "was

very inconsistent." *Id.* Ms. Bakner described Father's parenting deficits as follows.

> [Father] was able to verbalize different safety concerns. Like if the parent educator would leave the room, [Father] could verbalize that he needed to place [Child] in a safe place, such as a bassinet or a Pack-N-Play, or in a particular area on the floor. However, [Father] needed multiple prompts in order to perform this. He would leave [Child] on a changing table to retrieve a toy. [Father] could verbalize that he knew he wasn't to leave [Child] on that changing table, but multiple times throughout the skills sessions, he would do so. So these are just a few of the safety concerns.

> * * *

> He had a real hard time with structure and routine. He was not able to pick up on [Child's] cues [and] determin[e] what his needs were, such as being hungry or just needing comfort. [Father], more or less, went on a time line. If [Child] needs to eat every two hours, at exactly two hours, [Father] was going to feed him, whether [Child] was showing those signs or not. And as [Child] grew, of course, his needs changed, as far as the amount [and type of need], and the time line, and being able to pick up on [Child's] cues. And without prompts, [Father] was unable to do so.

> * * *

> The progress that [Father] did show, … was his ability to verbalize. Some of the one-on-one sessions that he had with the parent educator, he did retain some of the knowledge. He just wasn't able to demonstrate what he had learned. He did learn how to make a bottle, and that was good, and he did show the ability to change a diaper.

*Id.* at 7-8.

Ms. Bakner further testified that Father lacks life skills. *Id.* at 13. Ms. Bakner explained that Father had difficulty maintaining a healthy lifestyle for

himself, and had no motivation to improve. *Id.* Father exhibited poor hygiene and appeared "very disheveled" during his visits with Child. *Id.* at 18. Father also reported that he often "would stay up until 3:00, 4:00, 5:00 in the morning playing video games…. This was something that he was not willing to give up." *Id.*

CYS also presented the testimony of caseworker, Caitlin Smith. Concerning Father's home, Ms. Smith testified that she made at least twelve attempts to visit the home during Child's dependency, but that "[n]obody would answer the door. There [were] times where [she] could hear somebody in the home. [She] wasn't aware if they could hear [her] knocking or they just didn't want to open the door." *Id.* at 34-35. Ms. Smith even scheduled approximately two visits with Father in advance, but Father failed to keep the appointments. *Id.* at 35. Ms. Smith finally gained access to Father's home in March 2017, when she served Father with notice of the termination hearing. *Id.* at 33, 36. Ms. Smith found Father's home to be cluttered. *Id.* at 37. She explained, among other things, that Father had a rabbit, a cat, and two dogs, and that there were various items lying on the floor, including pots, pans, and cleaning utensils. *Id.* at 57-58. In addition, Father acknowledged having bedbugs and cockroaches in the home, and "that he [was] having trouble with an exterminator. The exterminator that the landlord had come out was unable to treat the home because of the amount of clutter and debris in the home." *Id.* at 35.

Thus, the record confirms that Father is incapable of parenting Child, and that Father cannot, or will not, remedy his parental incapacity. When presented with the opportunity to learn appropriate parenting skills, Father rejected much of the instruction offered to him, and made little progress. Moreover, Father exhibited an unwillingness to adjust his lifestyle in order to provide for Child's needs. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

In addition, Father lacks appropriate housing. Father failed to resolve his pest issue, and Father's home remains unsafe. During the termination hearing, Father acknowledged that his landlord sent an exterminator to his home twice, but that the exterminator refused to treat the home because it was too cluttered. N.T., 4/11/2017, at 63-64. After the second failed attempt, the landlord refused to pay for further exterminators. *Id.* at 64. Father further acknowledged that his home is in need of repairs and would be dangerous for Child. *Id.* at 65, 77. While Father claimed that he had been searching for a new home since the previous year, the court rejected this testimony as incredible. *Id.* at 77. Thus, Father's lack of appropriate housing was not beyond his control. For all of the forgoing reasons, we

conclude that the court did not abuse its discretion by terminating Father's parental rights pursuant to subsection 2511(a)(2).

We next consider whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to subsection 2511(b). We have discussed our analysis under subsection 2511(b) as follows.

> [Subs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term bond is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the orphans' court concluded that terminating Father's parental rights would best serve Child's needs and welfare, so that Child may continue to benefit from the permanency, security, and stability provided by

his foster parents. Orphans' Court Opinion, 6/9/2017, at 28-29. The court found that Child's relationship with Father is "minimal, even superficial, at best," that Child does not share a parent/child bond with Father, and that Child instead is bonded with his foster parents. *Id.* at 29. The court further found that Child will suffer no lasting effects if Father's parental rights are terminated. *Id.*

Father argues that the orphans' court cannot terminate his parental rights simply because Child's foster family is "better" than his biological family. Father's Brief at 26-27. Father further argues that Child is bonded to him and will be harmed if his parental rights are terminated. *Id.* at 27. Father contends that, since Child is too young to understand the concept of adoption, providing Father with more time to achieve reunification will not harm Child, but will actually help him by giving him every opportunity to be reunified with his biological family. *Id.* at 27-28.

We again discern no abuse of discretion. Ms. Bakner testified that Child did not appear to recognize Father as a parental figure. N.T., 4/11/2017, at 12. During their visits together, Child would look to Father's parenting instructor, rather than Father, for comfort. *Id.* at 12. Ms. Smith further testified that Father made little effort to bond with Child. *Id.* at 24. She explained,

> We were trying to ensure that bond by giving [Father] prompts and guidance in how to hold, how to get on the floor and play, how to engage, how to interact, and [Father] was very

stand[-]offish.  Most times, he wanted to sit on the couch and watch [Child] play.  He did say, "I love you, son" but it was very disconnected.

*Id.*  In contrast, Ms. Bakner testified that Child is bonded with his foster mother.  *Id.* at 12.  Child's demeanor with his foster mother is much different than his demeanor with Father; while Child is "very withdrawn" during his visits with Father, Child reaches for his foster mother, is active, playful, and communicates verbally.  *Id.* at 25.

Thus, the record supports the finding of the orphans' court that Child's needs and welfare will best be served by terminating Father's parental rights.  Contrary to Father's argument on appeal, it is clear that the court did not terminate his parental rights merely because it believed that Child's foster family is "better."  Father is incapable of caring for Child and will not be capable at any point in the foreseeable future.  Moreover, Child has never lived with Father, and appears to have no parental connection to him.  Child is bonded with his foster mother, and terminating Father's parental rights will allow Child to achieve permanence and stability.  It was well within the court's discretion to conclude that Child's life should not be put on hold any longer when reunification with Father is not a realistic option, and when Child will not suffer any emotional distress if his relationship with Father is ended.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating Father's parental rights to Child involuntarily.  Therefore, we affirm the court's April 12, 2017 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/20/2017